**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION**

| | | |
|---|---|---|
| **JAYLEN BLACK,** | ) | |
| **HANNAH DAVIS,** | ) | |
| **KIM LUONG,** | ) | |
| **KAYLAH OATES-MARABLE,** | ) | |
| **LATERRIA SHELBY,** | ) | |
| **JESSICA SWANSON,** | ) | **Civil Action File No.:** |
| | ) | **1:26-cv-05458-SDG-CCB** |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| | ) | |
| **PLANNED PARENTHOOD** | ) | |
| **SOUTHEAST, INC. and** | ) | |
| **PLANNED PARENTHOOD** | ) | |
| **FEDERATION OF AMERICA,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**AMENDED COMPLAINT** [1]

Plaintiffs **Jaylen Black, Hannah Davis, Kim Luong, Kaylah Oates-Marable**, **LaTerria Shelby**, and **Jessica Swanson** file this civil rights action for relief and damages against Defendants **Planned Parenthood Southeast Inc.** and **Planned Parenthood of America, Inc.,** based on the following factual allegations and causes of action.

[1] Plaintiff Luong initially filed an individual claim against Planned Parenthood Southeast Inc. on September 21, 2026. (Doc. 1). This amended complaint is filed pursuant to Fed. R. Civ. Pr. 15(a)(1)(A).

## NATURE OF THE ACTION

1. This action arises under the retaliation provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-3(a) and for one plaintiff, Jaylen Black, under the Americans with Disabilities Act, 42 U.S.C.A. § 12112(a).

2. Planned Parenthood Southeast Inc. ("PPSE") is an affiliate of the national reproductive rights organization Planned Parenthood Federation of America ("PPFA"). The two organizations are a jointly integrated enterprise.

3. PPSE services Alabama, Mississippi, and Georgia, states that in the wake of the Supreme Court's 2022 overturning of *Roe v. Wade* have enacted some of the nation's most restrictive bans on abortion.

4. To most of PPSE's donor and grassroots constituency, the hostile political environment has only heightened the need for vigorous advocacy. But the six former PPSE employees who bring this lawsuit allege that from 2024 to 2025 PPSE chose the path of trimming its sails against the wind: they allege that PPSE installed a new executive leadership team unaligned with the organization's mission and values, much less its core sensibilities about the dignity of its own employees.

5. All six plaintiffs openly challenged PPSE's drift from its mission and its curtailment of its services and outreach to a LGBT community that has faced constant political and legal attack.

6. The plaintiffs allege that as PPSE retreated from its core, its human resources ("HR") culture deteriorated as well, particularly to the detriment of employees who are transgender. Also, an organization dedicated to reproductive autonomy permitted a senior leader to pressure the child-bearing choices of female employees.

7. PPSE is not a government entity and is therefore not subject to suit for suppressing internal speech or dissenting viewpoints. But it is a private employer subject to suit for targeting employees who engage in Title VII protected activity and that is exactly what all six plaintiffs allege occurred in their respective cases.

8. In mid-September 2025, PPSE's HR team received internal complaints originating from Kaylah Oates-Marable, the Georgia State Director; Hannah Davis, the Public Policy and Organizing Manager; and Kim Luong, a Georgia-based Community Organizer, that they were being subjected to unwarranted gender-based scrutiny by PPSE's newly hired executive director. The HR team further learned that Oates-Marable had recorded conversations that she believed were proof of a gender-based hostile work environment.

9. In July 2025, Jessica Swanson, the Director of Education, lodged an internal complaint about an incident during a staff call in which a transgender employee was identified by their birth name, and therefore "outed".

10. In late September 2025, Oates-Marable, Davis, Luong, and Swanson, were all abruptly fired.

11. In July 2025, LaTerria Shelby, the Mississippi based Health Educator and Outreach Coordinator, was laid off after raising internal concerns that PPSE was abandoning significant parts of its public health portfolio, including outreach to the LGBT community.

12. During 2024 and 2025, Jaylen Black served as the highest ranking member of PPSE's communications team, holding simultaneously the titles of Vice President of Communications and Marketing and interim Vice President of External Affairs.

13. After reporting to the new CEO of PPSE feedback about the mistreatment of a transgender staffer and about the policy direction of the organization, Black was informed that her communications and marketing position was being eliminated; in August 2025, the external affairs role was filled with a substantially less qualified candidate. In December 2025, while on medical leave, Black was informed that she no longer had any role at PPSE and was officially terminated.

14. All six plaintiffs engaged in Title VII protected activity in a more comprehensive sense. To the extent that PPSE's policy changes constituted a deliberate retreat from alignment with its LGBT/transgender constituents, PPSE's

LGBT/transgender employees might themselves have reasonably perceived the radical change in direction as a sign of hostility toward their sexual identity. Therefore, Plaintiffs' unsuccessful efforts to reverse PPSE's commitment to a discrete protected class simultaneously challenged a potentially unlawful hostile workplace environment.

15. All six plaintiffs bring claims under Title VII to recover the value of lost wages and benefits, compensatory damages for emotional distress, punitive damages, as well as their attorney's fees and expenses. Jaylen Black asserts her own claim for lost wages, compensatory damages, and attorney's fees under the ADA.

## PARTIES

16. At all times relevant to this lawsuit, Plaintiffs were employed by and reported to the Atlanta-based central headquarters of PPSE.

17. PPSE is a non-profit corporation subject to suit under Title VII and the ADA.

18. PPFA is a nonprofit organization headquartered in New York City subject to suit under Title VII and the ADA.

19. PPSE operates solely as an affiliate of PPFA.

20. PPFA and PPSE, as alleged in the factual allegations herein, function as an integrated enterprise.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

21. Plaintiff Black timely filed her EEOC charge and received a notice of Right to Sue on September 24, 2026.

22. Plaintiff Davis timely filed her EEOC charge and her notice of Right to Sue is pending as of October 19, 2026.

23. Plaintiff Luong obtained a Right to Sue on June 23, 2026 and timely filed her lawsuit on September 21, 2026.

24. Plaintiff Oates-Marable timely filed her EEOC charge and received a notice of Right to Sue on July 22, 2026.

25. Plaintiff Shelby timely filed her EEOC charge and received a notice of Right to Sue on September 16, 2026.

26. Plaintiff Swanson timely filed her EEOC charge and received a notice of Right to Sue on September 24, 2026.

## PERSONAL JURISDICTION

27. PPSE is subject to service at the location of its registered agent, Regina Cofer, at 241 Peachtree St. NE, Suite 400, Atlanta GA., 30303.

28. PPFA is subject to service at the location of its registered agent, Corporate Creations, Inc., at 2985 Gordy Parkway, 1st Floor, Marietta GA., 30066.

## SUBJECT-MATTER JURISDICTION AND VENUE

29. Jurisdiction of this court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343.

30. Venue is proper in this district and division under 28 U.S.C.A. § 1391(b)(1)-(2), as Defendants conduct business in this district and division and the acts or omissions giving rise to the claim occurred in the same venue.

## FACTUAL ALLEGATIONS

### The integrated relationship between PPFA and PPSE

31. PPFA is regarded as one of the leading national champions of safe reproductive rights. Its mission extends beyond protecting access to legal abortions to promoting sexual health and sex education.

32. As its website proclaims, PPFA "is made up of many separate non-profit organizations across the country."

33. PPFA consists of 47 member organizations who in many ways operate separately: for example, each membership entity establishes their own respective executive leadership team, financial operations, and staff structure.

34. Despite the degree of administrative responsibility, PPFA literally licenses its affiliates. To validly operate under the name "Planned Parenthood",

member entities must adhere to programmatic and organizational standards adopted by PPFA and its national board of directors.

35. PPFA also provides ongoing institutional leadership, support, and guidance to its affiliates. This case illustrates that the level of engagement is often not arms-length: as the facts herein allege, after widespread national scrutiny in late 2025 of PPSE's terminations of employees including the plaintiffs, PPFA directed one of its California based affiliates, Planned Parenthood Los Angeles, to assume management and leadership of PPSE.

36. In addition, as a stop gap measure after the forced departure of PPSE's Chief Executive Officer ("CEO") Mairo Akpose in December 2025, PPSE's board publicly announced that Planned Parenthood Action Fund, the policy and advocacy arm of PPFA, would assume responsibility for hiring Oates-Marable's replacement as Georgia state director and that the new director would report directly to the Action Fund.

37. PPFA's active intervention in the personnel affairs of PPSE–operational management, crisis management, hiring of personnel, reporting structure–reflects a degree of centralized control over labor relations consistent with an integrated enterprise.

**CEO Mairo Akpose's realignment of PPSE's priorities**

38. Mairo Akpose was named interim CEO of PPSE in 2024 after serving a one year stint as Chief People and Culture Officer for the organization. In late 2024, members of PPSE's board of directors elected to discontinue the nationwide search for a new CEO and to maintain Akpose in the position.

39. Akpose's ties to the reproductive rights movement were nonexistent and she has scrubbed PPSE from her professional identity: her current Linkedin profile as of the writing of this lawsuit consists exclusively of corporate level HR roles and casts the entire time frame that she worked for PPSE as services provided for an unidentified entity under the auspices of TSG Advisory Group.

40. In a federal lawsuit Akpose filed against PPSE on October 14, 2026, Akpose describes herself as a "practicing Christian". [2]

41. After the 2024 presidential election, Akpose told senior level staffers that one of her goals was to rebrand PPSE's mission as less centered on abortion rights. At one point, in the presence of Georgia State Director Oates-Marable and Black, the Vice President of External Affairs, Akpose observed that "we talk about abortion too much, we focus too much on it." Both Black and Oates-Marable objected and cautioned Akpose about downgrading a key PPFA priority, especially

---

[2] *Akpose v. Planned Parenthood Southeast, Inc.,* Civil Action No.1:26-cv-06165 (N. D. Ga. October 14, 2026).

when the Georgia legislature was debating the criminalization of abortion from the onset of pregnancy.

42. Akpose also began to distance PPSE from alliances with the LGBT community related to public policy and sexual education and awareness initiatives.

43. Oates-Marable, whose duties included leading PPSE's political advocacy, was ordered in the late spring of 2025 to stop including voting records on LGBT policy topics in PPSE's legislative score card.

44. In early summer of 2025, Akpose directed Oates-Marable and the policy advocacy team that included Hannah Davis and Kim Luong that going forward, PPSE would stop partnering in Pride-themed events and Akpose questioned why LGBT-focused topics had become a priority of PPSE.

45. The Mississippi-based PPSE team, which included LaTerria Shelby in her role as Community Health and Outreach Coordinator, was also instructed in early June 2025 to withdraw from participation in sexual public health campaigns aimed at the LGBT community.

46. Oates-Marable, Shelby, Black, Davis, Luong, and Director of Education Jessica Swanson, all vocally expressed that Akpose's disengagement from LGBT initiatives ran counter to PPFA's national strategic priorities. Akpose defended her directives on the grounds that LGBT oriented events in the South

could be targeted for violence but not a single other PPFA affiliate adopted a policy of shunning LGBT events.

47. Some PPSE staffers including Swanson harbored suspicions that Akpose's views reflected an insensitivity or even hostility to LGBT causes. When Akpose served in her initial role as Chief People and Culture Officer, Swanson had raised concerns to her about a staff meeting in which senior staffers persisted in referring to an LGBT official at PPSE by their birth gender pronoun.

48. Akpose responded by telling Swanson that the incident was innocuous and did not merit counseling or correction. When Akpose interviewed Swanson in early 2025 for the position of Director of Education, while Swanson was selected, Akpose remarked that Swanson was "too passionate about" her concerns related to the marginalization of transgender staffers.

49. In a leadership team staff call in July 2025 to discuss several personnel changes, Swanson was taken aback when Akpose openly referred to a transgender employee by their birth name, a practice sometimes referred to as "deadnaming" that the transgender community views as deeply offensive. The use of the employee's original name also had the potential effect of outing their sexual identity to their former colleagues.

50. Swanson reported Akpose's conduct to the HR team,which took no action based on the complaint, and Black, who was present during the call, directly addressed the issue with Akpsose and Chief of Operations LaTosha Kerley, who both dismissed the episode.

51. When the same transgender employee who had been misnamed was laid off later in July, Black raised concerns that the termination was unwarranted and posed risk for PPSE.

52. Several of the plaintiffs suspected that they were being subjected to retaliation for raising internal objections to the revamping of mission goals at PPSE. After Oates-Marable expressed in leadership level meetings that Akpose was shifting away from traditional PPSE priorities, Akpose prevented her from attending a national gathering of PPFA affiliate state directors. Akpose also withdrew funding for community outreach initiatives by the policy team led by Oates-Marable.

53. In June 2025, Black was informed that her original job of Vice President of External Marketing was being eliminated and that her interim role as Vice President of External Affairs was going to be posted. Despite being initially encouraged by Akpose to apply for the External Affairs role, in August 2025, she was notified that another candidate had been hired to replace her.

54. The candidate selected instead of Black, Tangela Parker, was not only substantially less experienced in high stakes public policy campaigns, she had been forced to resign her prior position with the Atlanta Airport Authority after media reports linked her to an internal investigation of improper spending practices.

55. In July 2025, Shelby, who had questioned the order to cancel several LGBT health outreach events in Mississippi, was notified that her position was being eliminated. She was told that the rationale was budgetary.

56. Shelby was informed by PPSE's HR department that the organization would honor the commitment in the employee handbook to pay unused PTO upon separation only if she agreed to sign a non-disparagement provision strictly prohibiting her from making any public criticism of PPSE and a waiver of any potential claims under Title VII.

57. Shelby declined the conditions of the severance offer.

58. In August 2025, Akpose hired a former member of the city council in East Point, Georgia, Karen Rene, to the newly created position of Executive Director of PPSE.

59. Unlike Akpose, Rene did have a history of social justice engagement, serving as a Vice President for the Georgia NAACP and in several executive level jobs at economic empowerment organizations. But in a 2022 media interview,

Rene referred to herself as “pro-life”, a phrase widely associated with opposition to reproductive rights.

60. Rene would immediately become a source of controversy within the organization. Some of the conflict related to her comment at a PPSE community event describing a particular abortion procedure as “dismembering babies”, a jarring adoption of anti-choice rhetoric that stunned and outraged several partners of PPSE who were present.

61. Both Rene’s demeanor and engagement with staffers produced immediate conflict. During routine staff discussions, Rene reproached Oates-Marable’s all-female team as “pushback queens” whenever they offered differing views on policy approaches.

62. At other points, Rene engaged the policy team in an uncomfortably familiar tone.In a one-on-one session, Rene observed that Oates-Marable had a “body that women would pay for”, a line not remotely appropriate for a supervisor/subordinate interaction.

63. Rene made repeated suggestions to Hannah Davis that she should “make a baby” with her husband during an upcoming vacation in Paris, and questioned Kim Luong on several occasions about whether she and her husband planned to have children. Both Davis and Luong took the remarks as intrusive

commentary on their child-bearing decisions-a particularly odd lurch into personal space at an organization that champions reproductive autonomy.

64. Whatever Rene's intentions, the Alabama based state director, who was male, shared with Oates-Marable that he had not at any time been questioned about child-rearing choices or his interest in fatherhood.

65. In mid September 2025, Luong and Davis both talked with their supervisor Oates-Marable about their increasing discomfort with their communications with Rene. Oates-Marable in turn met virtually with PPSE's HR generalist Zoe Wooten to lodge a verbal complaint that Rene was creating a gender based hostile environment.

66. During the meeting with Wooten, Oates-Marable recounted in detail Rene's comments to Davis and Luong as well as the innuendo about her own physique, the difference in Rene's engagement with the male Alabama director, and the "pushback queen" allusions.

67. Oates-Marable also disclosed to Wooten that she had in her possession several tape recordings that she believed bolstered her narrative of inappropriate gender-based comments by Rene.

68. Wooten's reaction left Oates-Marable feeling demoralized. At several points, Wooten indicated that she would not take the time to listen to the recordings

of Rene and excused Rene's conduct on the grounds that she was a new hire who lacked familiarity with the culture at PPSE and needed time to learn.

69. Oates-Marable then turned to PPSE's recently hired HR Vice President Shaniq Carmichael, who advised her that a thorough investigation of the complaint would be undertaken. Carmichael's assurances were consistent with PPSE's internal handbook, which guarantees a thorough investigation of any claims of inappropriate or discriminatory workplace conduct.

70. Despite the promises of its handbook and its senior HR officer, PPSE did not conduct any investigation of the claims Oates-Marable reported.

**Akpose's purge of PPSE staffers and its aftermath**

71. On September 30, 2025, PPSE terminated Oates-Marable, Luong, Davis, and Swanson, along with the Alabama state director.

72. Once again, PPSE attempted to use a PTO payout as an inducement to pressure terminated employees to surrender their legal rights. Oates-Marable, Luong, Davis, and Swanson were all told that their payment of unused PTO was contingent on signing a non-disparagement clause and waiting their rights to file Title VII claims. Like Shelby, they refused.

73. In early October 2025, the terminated staffers organized a virtual call with other PPSE employees who had been fired after Akpose's ascension to the

CEO role, including Shelby in the Mississippi office. They shared details that had a common theme: all had raised objections to the internal direction of the organization, including its deprioritization of abortion rights and PPSE's alliances with the LGBT community. Several, including Oates-Marable and Swanson, had initiated HR complaints.

74. For the first time, it would have become apparent to Shelby that her ostensible firing for cost-saving reasons was not an isolated and justifiable event but an element of an organization-wide retaliatory purge, thereby triggering her knowledge of a viable Title VII claim.

75. In the fall of 2025, following a flurry of online articles about the upheaval at PPSE, its board of directors commissioned the Atlanta office of Reed Smith LLP to conduct an investigation. Their report has not been released and its scope remains uncertain.

76. According to Akpose's just filed lawsuit, the Reed Smith investigation "exonerated her”--but of what is not clear. None of the plaintiffs terminated in July and September 2025 were interviewed; nor was Jaylen Black. Nor were any of the plaintiffs asked to provide a written explanation of the circumstances of their separation.

77. A rigorous investigation of potentially unlawful employment practices would have certainly uncovered the HR complaints by Swanson and Oates-Marable in July and September 2025 as well as the surge of firings without any history of poor performance.

78. Akpose was eventually terminated in December 2025, ironically, only after she raised her own complaints to the Board that the scope of her job responsibilities was being curtailed for racially discriminatory reasons.

**Jaylen Black's disability claim**

79. In mid July of 2025, Black suffered serious injuries during a much-reported escalator malfunction at an Atlanta area Beyonce concert. Her recovery required a medical leave of absence.

80. Despite being initially encouraged to apply for the VP of External Affairs position, Black ended up being passed over for the role roughly a month after sustaining her injuries and going on leave, in favor of a less credentialed candidate who as noted herein had been linked to financial irregularities in her previous job.

81. In November 2025, Black informed PPSE's leadership team that she was physically able to return to work but required accommodations related to the impairment to her mobility that she suffered from her injuries.

82. On December 29, 2025, Black was notified that her accommodations could not be satisfied and that her employment at PPSE had been terminated.

**Plaintiffs' Title VII protected activity**

83. While this circuit's case law does not recognize Title VII discrimination claims based on solidarity or advocacy for persons in a protected class, the principle of causation in retaliation cases permits a theory of liability that treats traditional protected activity as one but-for cause of termination in conjunction with other factors outside Title VII's reach.

84. The climate imposed at PPSE punished dissent. Therefore, all six plaintiffs suffered adverse actions in part because they challenged PPSE's retreat from its alliances with the LGBT community and its vigorous defense of female reproductive rights, and in part because they took additional steps to oppose unlawful employment practices within their workplace.

85. The unlawful workplace practices Plaintiffs challenged included: (1) for Jessica Swanson and Jaylen Black, actions by PPSE's senior leadership degrading a transgender employee; (2) for Kaylah Oates-Marable, Kim Luong, and Hannah Davis, the creation of a workplace climate that was demeaning and psychologically unsafe for certain female employees; (3) for each terminated

plaintiff, a demand that they sacrifice their legal rights in order to receive a leave payout to which they were entitled.

86. PPSE's staffers included individuals who were LGBT, transgender, or nonbinary in their gender identification, all of whom would have experienced Akspose's aggressive distancing from outreach to their specific communities of sexual orientation or sexual identity. Consequently, when all six plaintiffs internally opposed PPSE's abandonment of its LGBT alliances, they were in effect challenging a course of action that could reasonably have created a hostile environment for their LGBT/transgender coworkers, a theory of Title VII liability recently recognized in *Seawright v. Lucas*, 2026 WL 2970365 at *8-11 (N.D. Cal. Oct. 2, 2026).

## CAUSES OF ACTION

## COUNT I

**(on behalf of Jaylen Black, Hannah Davis, Kim Luong, Kaylah Oates-Marable, Jessica Swanson, LaTerria Shelby against Planned Parenthood Southeast Inc. and Planned Parenthood Federation of America, Inc.)**

**(Retaliatory termination in violation of Title VII, 42 U.S.C. A. § 2000e-3(a))**

87. Plaintiffs incorporate by reference the factual allegations of this complaint as though set forth fully and separately herein.

88. Plaintiffs engaged in various forms of protected activity in that they opposed discriminatory workplace practices under Title VII, as alleged in paragraphs 85 and 86.

89. The protected activities of Plaintiffs Davis, Luong, Oates-Marable, Swanson and Shelby were, in each of their respective cases, a but-for cause of their termination, and of the denial of PTO payouts to which they were entitled under PPSE's internal policies.

90. Plaintiff Black's protected activity under Title VII was a but-for cause of her non-selection as Vice President of External Affairs.

91. PPFA and PPSE, as alleged in paragraphs 31-37, function as an integrated enterprise.

92. As a result of the retaliatory conduct by Defendants under Title VII, Plaintiffs suffered monetary damages in the form of lost wages and benefits, and noneconomic damages including emotional distress, humiliation, embarrassment, and mental anguish.

**COUNT II**

**(On behalf of Jaylen Black, against Planned Parenthood Southeast Inc. and Planned Parenthood Federation of America, Inc.)**

**(Discriminatory termination in violation of the ADA, 42 U.S.C.A. § 12112(a)**

93. Plaintiff Black incorporates by reference the factual allegations of this complaint as though set forth fully and separately herein.

94. Black was a qualified individual under the ADA in that she suffered from limitations on mobility based on serious injuries she sustained.

95. Black could have performed the essential functions of a senior communications role at PPSE with reasonable accommodations.

96. PPSE discriminated against Black on the basis of her disability by terminating her rather than affording her reasonable accommodations.

97. PPFA and PPSE, as alleged in paragraphs 31-37, function as an integrated enterprise.

98. As a result of the discriminatory conduct by Defendants under the ADA, Plaintiff has suffered monetary damages, including but not limited to back pay and front pay; loss of economic opportunity and future benefits; and noneconomic damages including emotional distress, humiliation, embarrassment, and mental anguish.

## PRAYER FOR RELIEF

Wherefore, based on the above-stated claims, Plaintiffs demand a trial by jury and that the following relief be granted:

A. Back pay, front pay, and lost benefits.

B. Compensatory damages to the extent allowed by law under Title VII and the ADA.

C. Punitive damages based on Defendants' reckless indifference to Plaintiff's federally protected rights.

D. Attorneys' fees and costs of litigation.

E. Pre-judgment and post-judgment interest at the highest lawful rate.

F. Such other equitable and monetary relief as the court deems just and proper.

Respectfully submitted the 19th day of October, 2026.

**HKM Employment Attorneys LLP**

*s/Artur Davis*
Artur Davis[3]
ASB-3672-D56A
2024 3rd Ave. North, Suite 212
Birmingham, AL 35203
Direct: 205-881-0935
adavis@hkm.com

*s/Jerilyn Gardner*
Jerilyn Gardner
Georgia Bar No. 139779
3344 Peachtree Rd. NE, Suite 800
Office #35
Atlanta, GA 30326
Direct: 404-446-9544
jgardner@hkm.com

[3] Artur Davis will promptly file for admission *pro hac vice* as an attorney of record in this action. Mr. Davis is licensed in the state of Alabama and the District of Columbia.

*s/Kathleen Bensberg*
Kathleen Binsberg[4]
Indiana Bar No.
320 N. Meridian Street, Ste 615
Indianapolis, IN 46204
Direct: (463)261-1887
kbensberg@hkm.com

**Counsels for Plaintiffs**

[4] Kathleen Bensberg is admitted *pro hac vice* as an attorney of record in this action.